# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1139


## DANAE MARIE GUILLOT STARKS

## VERSUS

## BRAD DYSON STARKS


**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. 87644
HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of John D. Saunders, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.


**AFFIRMED.**

**Richard Ducote**
**Attorney at Law**
**318 East Boston Street, Second Floor**
**Covington, LA 70433**
**(985) 898-2755**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Danae Marie Guillot Starks**

**T. Taylor Townsend**
**Attorney at Law**
**P. O. Box 784**
**Natchitoches, LA 71458-0784**
**(318) 238-3612**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Brad Dyson Starks**

**Danae Marie Guillot Starks**
**In Proper Person**
**200 Highway 114**
**Hessmer, LA 71341**
**PRO SE:**
     **Danae Marie Guillot Starks**

**GREMILLION, Judge.**

Danae Marie Guillot Starks appeals the trial court judgment awarding interim custody of the two minor children to the paternal grandparents with the parents having supervised visitation. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Danae Marie Guillot Starks (Danae), the mother of the two minor children, Eastin, born 7/25/08 and Kennadi, born 10/11/12, appeals the trial court's judgment awarding custody to the paternal grandparents and granting her supervised visitation. Danae and the defendant-appellee, Bradley Starks (Brad), were married in September 2007. On February 22, 2015, Danae was shot in the head and arm. In March 2015, she filed a petition for a divorce alleging that Brad had been physically abusive to her "on a repetitive basis throughout the marriage." While the petition alleged that Danae "suffered a gunshot wound to her left-upper forehead with the bullet traveling through her face and exiting her lower left jaw," Brad was not named as the shooter. The petition states that the "facts surrounding the event remain under investigation by the Sabine Parish Sheriff's Office." Danae requested sole custody of the children with supervised visitation rights by Brad. Numerous procedural motions were subsequently filed relating to venue, and the matter was subsequently moved to Natchitoches Parish from Sabine Parish.

Brad filed an answer and requested that he be awarded sole custody due to Danae's "severe mental illness." Brad thereafter filed a petition for temporary custody and an ex parte order urging that Danae suffered a self-inflicted gunshot wound and was refusing to seek mental health and/or psychiatric counseling for the issues that led to the self-inflicted gunshot wound. He further argued that Danae attempted to check-out their children from school, which resulted in the school going on "lockdown." Brad was granted temporary custody, and Danae was given

supervised visitation and prohibited from entering the children's school. In May 2015, Danae filed a declinatory exception of lis pendens arguing that the same matter was pending in Avoyelles Parish. Danae filed a petition for divorce in Avoyelles Parish on April 16, 2015. In June 2015, the trial court denied Danae's exception of lis pendens.

Following a June 2015 hearing, the trial court, Judge Lala Sylvester presiding, ordered all of the parties to undergo mental health evaluations with Dr. John C. Simoneaux.

In July 2015, Brad filed a motion and order for writ of injunction to prohibit Danae from posting on social media that he had shot her and on a website that offers free reconstructive surgery to victims of domestic abuse. Brad attached numerous records in support of the writ. In July 2015, the trial court ordered all parties to undergo mental health evaluations with Shreveport-based Dr. Mark P. Vigen. Following a July 2015 hearing, all parties and the court agreed to have a hearing to determine culpability in the shooting of Danae (the shooting hearing) separately from the custody hearing while psychological evaluations were pending.

In August 2015, the trial court granted Danae supervised visitation with her children every Saturday. That same month, Brad filed a rule to fix child support. In November 2015, Danae filed a motion for temporary custody because Brad had been arrested in March 2015 and charged with possession of schedule IV controlled dangerous substance (Xanax), DWI, and possession of marijuana, had entered into a pre-trial diversion program, and had his driver's license suspended.

In January 2016, following five days of trial only relating to the shooting, Judge Lala Sylvester found that the gunshot wounds to Danae's head and forearm were self-inflicted. In eleven pages of reasons for judgment, Judge Sylvester concluded that Brad proved beyond a reasonable doubt that the shooting was a

failed suicide attempt. Danae filed a motion to designate the January 2016 judgment as a final appealable judgment. Danae also appealed the January 2016 judgment. Danae's motions to appeal the findings were denied.

In May 2016, a La.Civ.Code art. 102 divorce was granted. In July 2016, the trial court denied Danae's motion to designate the January 2016 judgment as a final appealable judgment and denied her motion to appeal. In August 2016, Danae filed a motion for access to school campus & education records, for court ordered drug testing, and for modification of custody. In October 2016, Danae filed a motion to recuse Judge Sylvester based on allegations of ex parte communications with the children's school. Judge Sylvester recused herself, not conceding that any legal grounds existed to mandate the recusal, but because Danae believed that the Court was not impartial. The supreme court appointed Judge Eric Harrington to preside ad hoc.

Danae filed another ex parte motion for modification of custody. Following an October 24, 2016 hearing, temporary custody of the children was granted to Ken Starks (Brad's father) and his wife, Barbara Jan Starks, who are to be assisted as needed by Sherrie Moore (Brad's mother) and Tom Moore. Brad was granted "closely supervised" visitation and Danae was granted custody three weekends each month from Friday until Sunday.

In February 2017, Judge Harrington, after considering the findings from the shooting hearing and the testimony of the evaluating psychologists and witnesses relating to the custody issue, rendered an interim custody order in April 2017. He issued extensive oral reasons for his judgment maintaining the placement of the children in the custody of the paternal grandparents while allowing the parents visitation with mandatory drug-testing. Judge Harrington found both Danae and Brad were unfit to have custody of their minor children and that it was in the best

interest of the children to be placed in the paternal grandparents' custody. Detailed instructions were provided in the custody order. In part, Danae was ordered to undergo counseling for a year until she was emotionally stable, and Brad was ordered to maintain sobriety for one year and undergo random drug testing. Danae's weekend visitations were modified to require supervision by her parents.

Danae now appeals both the January 2016 judgment finding that the gunshots wounds were self-inflicted and the April 2017 interim custody order. Danae assigns as error:

> 1. The trial court, Judge Sylvester, clearly erred as a matter of law and abused its discretion in refusing to hear the testimony of the parties' then 7-year-old son that he personally witnessed his father threatening his mother with a gun at the car window.

> 2. The trial court, Judge Sylvester, clearly erred as a matter of law and manifestly abused its discretion in allowing into evidence purported expert testimony regarding the location of Mr. Stark's cell phone before, during, and after the shooting.

> 3. The trial court, Judge Sylvester, clearly erred as a matter of law and manifestly abused its discretion in refusing to admit into evidence proof of how easily Danae Stark's handwriting could be copied by anyone.

> 4. The trial court, Judge Sylvester, erred as a matter of law and manifestly abused its discretion in finding beyond a reasonable doubt that Danae Starks shot herself.

## DISCUSSION

### *Standard of Review in Custody Matters*

In making decisions regarding custody, the best interests of the child are of paramount importance. La.Civ.Code art. 131. Numerous factors are at the trial court's disposal in making this determination and are set forth in La.Civ.Code art. 134. However, the trial court is not limited to considering the factors enunciated but should consider the totality of the facts and circumstances in the particular

4

situation. *Hawthorne v. Hawthorne,* 96–89 (La.App. 3 Cir. 5/22/96), 676 So.2d 619, *writ denied,* 96–1650 (La. 10/25/96), 681 So.2d 365.

A trial court's determination in a child custody case will not be disturbed unless there is a clear abuse of discretion. *Id.* Additionally, the trial court's finding is entitled to great weight on appeal as it is in a superior position to assess what the children's best interests are based on its consideration of the testimony of the parties and witnesses. *Id.*

## THE SHOOTING HEARING

First, we note the somewhat unusual procedural posture of this case to which all parties agreed, at a hearing on July 14, 2015, to litigate only the issue of culpability in the shooting of Danae as a factual matter to be determined before the custody motions could be settled, along with the resolution of the injunction filed by Brad to prevent Danae from posting claims on the internet claiming that he shot her. In Danae's pre-trial motion, she phrased the issue as, "At the July 14, 2015, conference it was agreed that the central question related to both the custody and injunction proceedings was whether Ms. Starks shot herself or whether Mr. Starks was involved in the shooting." Danae argued that Brad bore the burden of proving that she shot herself.

Brad's pre-trial brief states that contrary to Danae's pre-trial brief, "The only issue before the Court . . . is regarding the Writ of Injunction. The issue of custody is not before the Court. The custody issue can only be heard after the completion of Dr. Mark Vigen's evaluation." In his appellate brief, Brad argues that Danae bore the burden of proving that Brad shot her.

Clearly, the issue of whether Danae shot herself was a significant underlying factor in the overall custody determination, which was not held until February 2017.

5

*The Shooting*

Danae argues that the trial court erred as a matter of law and abused its discretion in finding that she shot herself.  She argues that there is a strong presumption in the law against self-destruction.  Danae also argues that there was no physical evidence that the shots were close contact shots, i.e., no stippling, no soot, no burns, no evidence of gun powder residue on her hand, and no explanation for the gunshot wound to her arm.

Considering the serious nature of the allegations in this matter, we carefully and closely examined all of the testimony and evidence relating to the shooting.  Judge Sylvester provided a thorough analysis of the evidence presented and why she reached her conclusion.  We fully adopt the trial court's reasons for judgment as our own:

> According to the testimony of Brad, he left the residence at Big Bass Lane around noon to drive to Natchitoches to pick up his children.  He testified that he stopped at Big Bass Marina for gas, spoke to several employees and then left to go to Natchitoches.  Brad testified that he began making phone calls as soon as he got reception as he drove towards, Many, Louisiana.  The Verizon cell records provide a map of Brad's phone movements on the afternoon of February 22, 2015.  The cell phone location information was undisputed and corroborated by witness' testimony.
>
> . . . .
>
> When Brad's cell phone picked up reception from the Verizon cell towers, he began to make outgoing calls as he drove towards Many.  At 12:29PM, Brad called Jessica Starks, but the call went to voicemail.  The call to Jessica Starks started and ended on Cell Tower 847.  Cell Tower 847 is located at 495 Magnolia Avenue in downtown Many.
>
> At 12:30PM, Brad called his friend, Justin Mitchell, and they talked for five minutes.  The cell phone call from Brad's phone to Justin Mitchell started on Cell Tower 809.  Cell Tower 809 is located at 795-925 Fisher Firetower Road, south of Many.  The cell phone call to Justin Mitchell ended on Cell Tower 847 located in downtown Many.

At 12:33PM, Danae sent Brad a text message which stated, "I'm sorry I did that to my car. It was an accident. All I ever wanted was you." The evidence is clear that Danae had not been shot at 12:33PM.

At 12:35PM. Danae called Brad's cell phone from the land line at 363 Big Bass Lane. Brad switched over from the call with Justin Mitchell and answered the incoming call from Danae. The 12:35PM phone call from Danae started on Cell Tower 847 located in downtown Many, lasted for 801 seconds (13.5 minutes) and ended on Cell Tower 853. Cell Tower 853 is located at 205 Laura Street in Robeline. Robeline is approximately 14 miles east of Many and since the cell phone call lasted about 13.5 minutes, Brad would have been in downtown Many or east of downtown Many at the time he received the call from Danae on the land line at 12:35PM.

The cell phone tower located in Robeline is 31.1 miles from Big Bass Lane. The cell phone tower located in downtown Many is approximately 17.4 miles from 363 Big Bass Lane, as determined by GPS coordinates. The distance between the Robeline cell tower and the Many cell tower is 13.7 miles.

Carey Etheridge, an expert in digital forensics with an emphasis on cell phones, testified that he examined Brad's cell phone records and Verizon cell tower records. Mr. Etheridge testified that he concluded to an absolute certainty that Brad's cell phone was not near 363 Big Bass Lane on February 22, 2015 at 12:35PM, the time of the call to Brad's cell phone from the land line at 363 Big Bass Lane. Mr. Etheredge further testified that Brad's cell phone was in the area of downtown Many at 12:35PM and in the area of Robeline at 12:48PM.

All of the individuals involved in the phone calls to and from Brad's cell phone from 12:30PM until 2:29PM, Justin Mitchell (friend), Melinda Rasmussen (neighbor), Jacqueline Guillot (Danae's mother), Sherie Moore (Brad's mother), testified that they spoke to Brad on February 22, 2015, that Brad called from his cell phone and that they knew it was Brad. Additionally, Detective Aaron Mitchell testified that Brad had his phone with him when he was interviewed at CID at 3:00PM and that Brad showed him text messages from Danae stating "Don't bring the kids back here" and "Good bye."

Danae failed to call any witness to refute the expert testimony of Carey Etheredge in interpreting the reliable and objective cell phone data from Verizon wireless, which concluded that Brad's cell phone was not near 363 Big Bass Lane at 12:35PM.

. . . There is simply no evidence indicating the presence of some unknown third-party. Danae testified that she had no enemies and did not know anyone who would have wanted to shoot her.

There was no sign of a burglary or break-in at 363 Big Bass Lane, and nothing at the crime scene indicated the presence of some unknown third-party. The Sabine Parish Sherriff's Office did not develop any unidentified third-party suspects.

. . . . Melinda Rasmussen testified that she found Danae on the floor in front of a chair, injured and bloody. Melinda testified that a gun was lying on the floor about a foot from Danae's hand, and that Danae tried to sit up when Melinda approached her. Melinda eased the gun away and took the gun outside and placed it on a chair. At 1:00PM, Melinda called 911. At 1:01PM, Melinda called Brad and advised him that Danae had "hurt herself". Additionally, Melinda advised Brad that she found Danae on the floor, injured and bloody, and that she had called 911 and help was on the way.

When Detective Brad Marr arrived at Sabine Medical Center, Danae was being treated in the Emergency Room. Detective Marr was unable to obtain any information from Danae, because she was incoherent. . . Results from a Urine Drug Screen analysis showed [Danae was] positive for marijuana, cocaine, amphetamines and benzodiazepines in her system.

Richard Ernest was accepted by the Court as an expert in shooting scene reconstruction, criminalistics and forensic ballistics. Mr. Ernest examined all of the evidence in the possession of the Sabine Parish Sheriff Office at his laboratory in Fort Worth, Texas. Mr. Ernest testified regarding the ballistic characteristics of the .380 handgun and bullet involved in the shooting. Mr. Ernest testified that ballistics testing of a .380 handgun in gelatin establishes that the bullet causes extensive damage as it enters, but loses velocity very quickly.

Mr. Ernest opined that the entry wound for the bullet was below the chin and that the bullet exited through the forehead. Mr. Ernest testified that he went to 363 Big Bass Lane and discovered a contact mark in the ceiling directly above the chair in which Danae had been sitting, and that the contact mark was consistent with a bullet striking the ceiling. Further, Mr. Ernest testified that when he examined the bullet under his microscope, he noticed white paint on the bullet, against consistent with the bullet striking the ceiling.

Dr. Patrick Besant-Matthews testified as an expert in Forensic Pathology. Dr. Besant-Matthews examined all relevant medical records, including hundreds of CT and radiographic images, along with photographs and other documents relevant to the shooting. Additionally, Dr. Besant-Matthews closely examined the CT scan of Danae's head taken at Sabine Medical Center on February 22, 2015 shortly after the shooting, but before any corrective measures or surgeries were performed on Danae that would have modified any evidence from the shooting.

8

Dr. Besant-Matthews testified that it was his expert medical opinion that the entry wound was below the chin and the exit wound was through the forehead. Dr. Besant-Matthews described and pointed out to the Court the upward trajectory of the bone fragments shown on CT scan around the sinus and palate. Dr. Besant-Matthews also explained that an exit wound will move the bone of the cranium outward and leave a "beveled" mark on the bone pointing back in the direction from which the bullet traveled, both of which were present on Danae's CT scans. The CT scan of Danae's head clearly matched the classic exit wound known to forensic pathologists.

Further, Dr. Besant-Matthews described and pointed out to the Court the presence of gas from the handgun in the soft tissue surrounding the chin and jaw on the CT scan consistent with the handgun being held under the chin and fired. Dr. Besant-Matthews further testified that the presence of gas in the soft tissue surrounding the chin and jaw is clearly inconsistent with the jaw wound being an exit wound, as it would require the gas to travel through the entry wound in the forehead, through the head, sinus and palate, and then lodge in and around the exit wound. Dr. Besant-Matthews further testified that the fact that a front lower tooth was blown out of Danae's mouth and landed across the room was consistent with an upward trajectory. He explained that it was inconsistent with a downward trajectory, which would have pushed the tooth downward into the jaw and soft tissue. Dr. Besant-Matthews further testified that the entry wound, exit wound and other supporting evidence were all consistent with a suicide attempt.

Detective Anthony Lowe was in charge of investigating the scene at 363 Big Bass Lane. Detective Lowe testified that a note was found on a table next to the bloody chair. The note stated, "Please forgive Me. Kennadi & Eastin. I love you. I'm so sorry."

Detective Anthony Lowe and Aaron Mitchell visited Danae at University Health Center on March 18, 2015. They showed Danae the suicide note and Danae stated the handwriting was hers or resembled hers, but that she had no memory of writing it.

Robert Foley testified as an expert in forensic document examination. He testified that he examined the suicide note and four other known samples of Danae's handwriting. Mr. Foley further testified that it was his expert opinion, to the highest degree of confidence expressed by document examiners, that Danae Starks wrote the suicide note.

The testimony is clear that people who have attempted suicide on prior occasions are at greater risk to attempt suicide again. Medical records established that Danae attempted suicide in 2004 when she took 15-20 Tylenol and was treated at Natchitoches Regional Medical Center. Danae's mother, Jacqueline Guillot, confirmed this fact when she was interviewed by Dr. Tiffany Best

during the initial psychiatric consultation at University Health Center on March 9, 2015, but denied it at trial.

Sherie Moore, Brad's mother, testified that she found Danae in the fetal position in her bed on April 14, 2014, with a gun pressed to her stomach. Sherie testified that Danae stated at that time, "I don't want to live like this." Danae testified that the gun was just next to her and she meant she needed help with her female problems.

Danae was transferred by ambulance to University Health Center in Shreveport late on the afternoon of February 22, 2015. Over the following days, Danae underwent numerous surgeries to repair the injuries caused by the gunshots. The testimony established that Brad spent significant time at University Health Center assisting Danae in any way he could such as: shaving her legs, washing her hair and giving her a sponge bath. There was no evidence to suggest that Danae was afraid of Brad or that she believed Brad shot her. In fact, both parties testified that they engaged in sexual activity while Danae was a patient at University Health Center.

At the request of the Sabine Parish Sheriff's Office, the Shreveport Police Department dispatched Detective Sherita Holden to University Health Center to interview Danae on March 3, 2015. Danae had a surgical procedure that morning and had been given painkillers. Detective Holden testified that Danae appeared drowsy, but coherent during the interview. She asked Danae a series of questions. Danae nodded "yes" when asked if she shot herself. Danae shook her head "no" when asked if Brad shot her. Brad was not present when Detective Holden interviewed Danae.

The trial court then reviewed the psychiatric care and progress notes that the staff at University Health Center made at their visits with Danae. Initially, Danae indicated she had no memory of any of the events and that her home life was going well. However, as time went on, she began to deny previous suicide attempts and refused to talk. Despite repeatedly claiming to have no memory of the events, she began to claim that Brad had shot her. The trial court noted that the final diagnosis set forth in the University Health Center record was "suicide and self-inflicted injury by firearms and explosives, unspecified." The trial court then reviewed the testimony of Danae's experts:

Dr. William Manion testified as an expert in Forensic Pathology, but acknowledged that he had no expertise in ballistics or firearms. It was Dr. Manion's expert medical opinion that Danae's

10

wound could not have been self-inflicted because: (1) she could not have shot herself with the bullet entering in the forehead and existing through the jaw and (2) there were two shots.

However, Dr. Manion's testimony should be disregarded in its entirety because his opinion was based on an "assumed fact not supported by the record," specifically incorrect bullet trajectory. . . . [T]he predicate fact regarding bullet trajectory was established by two highly qualified individuals.

Although it was available to him, Dr. Manion did not review the CT scan. He merely relied on the radiologist report. If he had reviewed the actual CT scan, he would have discovered the upward trajectory of the bone fragments in the sinus area, the upward bone and beveling of the skull at the exit wound and the gas located within the soft tissue around the jaw.

The correct bullet trajectory was established by two highly qualified experts, Richard Ernest and Dr. Patrick Besant-Matthews, who both concluded that the bullet entered under Danae's chin and exited through her forehead. Danae indicated she would call the radiologist to testify, but she did not call him to testify nor did she call anyone to rebut the opinions of Richard Ernest and Dr. Patrick Besant-Matthews.

Dr. Manion's testimony was flawed in other ways as well. Dr. Manion testified that Danae would have been totally incapacitated by the gunshot wound to the head. However, the evidence and testimony revealed that Danae was not incapacitated, but was attempting to sit up when she was found by Melinda Rasmussen. The very limited information relied on by Dr. Manion was inadequate to render the professional opinions he did in this case, and his testimony should be disregarded.

Once you take all the evidence and testimony presented at trial, it is clear Danae Starks' injuries were self-inflicted in a failed suicide attempt. After considering all of the undisputed objective physical evidence in the record, along with the text messages sent by Danae which stated, "Don't bring the kids back here" followed by 'Good bye", and the suicide note written in Danae's own handwriting that simply stated, "Please forgive Me. Kennadi and Eastin. I love you. I'm so sorry.", it is beyond a reasonable doubt that Danae's injuries were self-inflicted in a failed suicide attempt.[1]

---

[1] We are unsure of why the trial court used the "beyond a reasonable doubt" standard in this civil matter. It is debatable and not entirely clear from the record who bore the burden in proving who shot Danae. Danae has called into question who shot her since the divorce petition was filed, however, she did not allege Brad as the shooter until sometime later. Brad, on the other hand, challenged Danae's fitness to be a custodial parent because she shot herself. In brief, Brad states, "Danae accused Brad of shooting her, therefore Danae must prove that she was shot by Brad." In either case, because this is a civil matter, the preponderance of the evidence standard of proof should have been used in determining if Danae shot herself. *See Talbot v.*

*Exclusion of Minor Witness*

Danae's first assignment of error centers on the trial court's failure to allow Danae and Brad's seven-year-old son to testify that Brad threatened Danae on July 28, 2014 with a gun and that the child begged his father, "Don't shoot Mommy." The trial court heard testimony about the incident, with Brad testifying that he was removing a gun from the glove compartment of Danae's car. Danae argues that pursuant to La.Code Evid. art. 404, prior acts of domestic violence are admissible to prove the violent nature of the relationship and the identity of Danae's assailant. The trial court stated its reasons for excluding Eastin's testimony:

> Unlike cases wherein the child is a necessary or main witness, this child's testimony has nothing to do with events of February 22, 2015 and are not necessary to prove or disprove what happened on February 22, 2015. . . .The only professional . . . that has visited with the children is Robin Miley who in her report expressed concern about the profound effect on the well-being of the children this case has made on them. Also Ms. Miley's concern regarding the public position Ms. Starks has taken as a victim of domestic violence has had an adverse effect on the children who need protection from further trauma in their young lives. If the child was allowed to testify the purpose would be to support Ms. Starks' position. Further, since Mr. Ducote's cross-examination of Mr. Starks and his direct of Ms. Starks the Court believes he has made any points that need to be made and the child's testimony is unnecessary. Given the young age of the child which brings in possible issues of competency and suggestibility [, ] the fragile circumstances the child is in because of the parents' inability to co-parent at this time[,] and the concerns of Dr. Miley (sic) the Court finds that any testimony by the child would be of no purpose and it is not in the child's best interest to testify. And that the damage done to the child would far outweigh the probative value of any testimony he would give.

It is within the trial court's broad discretion to allow the testimony of a child. *Watermeir v. Watermeir*, 462 So.2d 1272 (La.1985); *Cooper v. Cooper*, 594 So.2d 939 (La.App. 3 Cir. 1992). For the reasons stated by the trial court, we find it was fully within its broad discretion to exclude Eastin's testimony. Even if this

---

*Talbot*, 03-814 (La. 12/12/03), 864 So.2d 590. Similarly, Danae bore the same burden of proving that Brad shot her as alleged. We find this error harmless however since the much harder burden of proof was met in finding Danae's gunshot wounds were self-inflicted.

testimony had been admitted into evidence, we agree with the trial court and find it would have no bearing on the issue of whether Danae shot herself on February 22, 2015 and is, therefore, not relevant. *See* La.Code Evid. art. 401. Accordingly, this assignment of error is without merit.

***The Cell Phone***

In this assignment of error, Danae argues that Etheredge's testimony was not based on sufficient facts or data and was not the product of reliable principles and methods. Danae further argues that because Brad's attorney formed an LLC for Etheredge's business several weeks after the shooting, the "questionable ethics" call into doubt the veracity of his testimony. We disagree.

The admissibility of expert testimony is set forth in La.Code Evid. art. 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

In determining whether a method is reliable, the trial court in exercising its gatekeeping function, utilizes the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), including peer review of the technique, rates of error involved in the technique, standards for using the technique, and the general acceptance of the method. *State v. Foret*, 628 So.2d 1116 (La.1993). Historical cell site analysis has been challenged and its methodologies have been accepted and are routinely used in the law enforcement

13

community. *See State v. Davis*, 13-275 (La.App. 3 Cir. 10/23/13), 129 So.3d 554; *writ denied*, 14-10 (La. 6/13/14), 140 So.3d 1186, *cert. denied*, 83 U.S. 3304, 135 S.Ct. 678 (2014), *State v. Saltzman*, 13-276 (La.App. 3 Cir. 10/23/13), 128 So.3d 1060, *writ denied*, 14-11 (La. 6/13/14), 140 So.3d 1187, *cert. denied,* 83 U.S. 3304, 135 S.Ct. 678 (2014), *State v. Jackson*, 15-809 (La.App. 4 Cir. 5/25/16), 193 So.3d 425, *writs denied*, 16-1471 (La. 6/6/17), 219 So.3d 1112, 16-1294 (La. 5/26/17), 221 So.3d 79. The trial court's "great discretion" in determining whether a party is qualified as an expert is subject to the abuse of discretion standard. *Davis*, 129 So.3d 554. Jennifer Dalmida, a custodian of records for Verizon Wireless, testified regarding the cell phone calls made from the cell phone assigned the number 318-332-5874 and identified as Brad's cell phone on February 22, 2015. Dalmida testified as to the manner that cell phone records are collected in the ordinary course of business.

Etheredge is a criminal investigator and runs the High-Tech Crime Unit at the Natchitoches Parish Sherriff's Office. He also owns Digital DNA Recovery, LLC, and has been qualified as an expert in digital forensics involving cell phones. Etheredge had worked for the Sheriff's Office since 2003, and had been an investigator since 2008. In 2009, the high-tech unit was created and Etheredge is in charge of it. Etheredge reviewed his extensive training in cell phone data retrieval and forensic mapping. He testified that he does historical cell phone data analysis for the Secret Service and FBI.

Etheredge described how cell phone companies record cell phone activity through cell towers and switches. Essentially, cell phone data is transmitted through GPS longitude and latitude coordinates. Etheredge then described how a computer system can plot points along a map to show the movement of the cell phone. He also stated that he plots the coordinates by hand for verification.

14

Etheredge examined Brad's cell phone records and Verizon cell tower records, which were provided by Dalmida pursuant to subpoena. Etheredge provided extensive documentation of Brad's cell phone activity that day. Brad's cell phone was in his possession and shown to Detective Aaron Mitchell at 3:00 p.m. on the day of the shooting. All of the parties that Brad spoke to that day verified their conversations with Brad on his cell phone number used by Etheredge to track the phone's location.

Etheredge concluded that at the time the 13.5 minute call from land line at the home of Brad and Danae ended, Brad was approximately 36 minutes, or forty to forty-four miles, away. It was stipulated that Rasmussen made a 911 call at 1:29 p.m. reporting that Danae had been shot. Etheredge concluded that based on the cell phone records, Brad would have been unable to shoot Danae.

The cell phone evidence proves that Brad was heading east toward Natchitoches from Many for the stated purpose of picking up his kids from his mother's house. Then he stopped and turned around and headed back toward Many. Danae provided no expert of her own to contradict the testimony of Etheredge. The trial court did not abuse its discretion in allowing Etheredge to testify regarding historical cell phone data. This assignment of error is without merit.

*The Suicide Note*

Danae claims that the note which read "Please forgive me. Kennadi and Eastin. I love you. I'm so sorry" could be construed as not being a suicide note and could have been written by someone else. The trial court refused to accept into evidence the handwritten note of Danae's friend to prove that anyone could have written the note. The friend's note was proffered. Danae put on no

handwriting expert evidence to refute Foley's testimony that he was absolutely certain that it was her handwriting.

The trial court did not err in excluding the handwritten note of her friend. Multiple times Danae confirmed that it looked like her handwriting, but she had no recollection of writing the note. Throughout the hearing, Danae made arguments and insinuated that the entire scene was a staged suicide and the note could have easily been written by someone else. We find that the totality of the circumstances belies such a theory. The trial court was within its discretion to exclude the note written by Danae's friend as it had no probative value. *See* La.Code Evid. art. 901.

### *Abuse of Discretion*

In this assignment of error, Danae argues the trial court abused its discretion in finding beyond a reasonable doubt that the gunshot wounds were self-inflicted. Danae addresses a number of factual findings, including the ones discussed above to show that it was not proven by a reasonable doubt that the gunshot wounds were self-inflicted. She further argues that there is a "strong legal presumption that a person chooses self-preservation over suicide, therefore suicide must be proven beyond a reasonable doubt." Danae cites jurisprudence relating to life insurance policies for this presumption. *See Brown v. Hartford Life Insurance Co.*, 593 So.2d 1376 (La.App. 5 Cir. 1992). We find no error in the trial court's finding that Brad proved beyond a reasonable doubt that Danae's gunshot wounds were self-inflicted. Even if we assumed, *arguendo*, that this presumption applies, we still find that it was proven far beyond a reasonable doubt that this gunshot wound was self-inflicted. Danae simply failed to offer any reasonable evidence supporting her allegation that Brad shot her or that some other third person shot her.

The alleged inconsistencies in Brad's testimony center on the minutes in which he was hearing what he did not think could be gunshots (he thought a

cabinet door was being slammed), his calling the neighbor, Rasmussen, to have her check on Danae, and the subsequent events that followed when he found out his wife had shot herself. There were numerous calls back and forth between Brad and Rasmussen. We do not find that the inconsistencies in the timing of Brad's statements, who was in a state of shock over what had transpired, were of any significance in the overall findings of the trial court, which were reasonably based on the evidence before it, and proved beyond a reasonable doubt that Danae shot herself.

Clearly, the trial court found the testimony of Brad's experts more persuasive. Coupled with the other significant factors indicating that the gunshot wound was self-inflicted, based on our review of the record, we are unable to say that the trial court abused its discretion. Such facts include: the cell phone records which indicate that Brad was not near the house when Danae was shot; the "suicide" note that was determined with absolute certainty to have been written by Danae; Danae's past history of suicide attempts; the facts following the shooting, including Brad assisting her at the hospital, and consensual hospital room sex; Detective Holden's testimony that Danae admitted shooting herself and denied that Brad shot her; the investigating officers finding that it was a failed suicide attempt; and the testimony of the parties.

All of the trial court's reasons for judgment are supported by the record. Therefore, we can find no error. Accordingly, the trial court did not abuse its discretion in finding that Danae's gunshot wound was self-inflicted.

**THE CUSTODY HEARING**

A bench trial in front of Judge Eric Harrington, presiding ad hoc, occurred on February 15, 2017. Testimony was heard and the 30-page report of

17

psychologist, Dr. Mark P. Vigen and licensed professional counselor, Dr. Shelley Visconte, was admitted into evidence.[2]

At the conclusion of the hearing, the trial court gave extensive oral reasons for its interim custody order. We note that the trial court wished to prevent further harm to the children in the future by preventing the dissemination of the confidential report of Drs. Visconte and Vigen noting that, in other cases, portions of these reports have been published online and significantly affect the children. The trial court specifically instructed the parties not to discuss any of the confidential findings with anyone. The trial court stated:

> I have to say I have been very impressed, especially with the court experts, Dr. Vigen and Dr. Visconte. . . . I do note at page 7 of their written report that the doctors very frankly stated that the recommendation that either of these children be raised by a foster family or [by] extended family seems to follow from the history of these parents. Quite a remarkable statement of the doctors' lack of confidence in these parents. . . . In reviewing the evidence here, I have applied to it uh, Article 134 of the Code, of the Civil Code as well as considering other factors and as a result I conclude that it is not in the best interest of the children for either parent to have physical custody at this point. . . . I note that the doctors have recommended that a year might be an appropriate time. I am aware that the visitation order currently in place allows unsupervised visitation for Ms. Starks. I issued that order last October because Mr. Starks said at that time that he did not fear for the children's safety while in her presence. The doctors have recommended that she go to an arrangement that requires her visitations with the children to be supervised by Mr. and Mrs. Guillot. The doctors are of the opinion that she still tends to deny and minimize the problems that she has. And although there is no evidence of substance abuse on her part since the shooting incident the doctors note diagnosis from that time of alcohol abuse in remission, stimulant use disorder, anxiolytic use disorder and cannabis use disorder episodic. They have diagnosed her now with cannabis use disorder in remission. That means those issues and others are not resolved and have not been dealt with by her and therefore are subject the reappear. Therefore they recommend supervised visitations. I agree and that is what I will order. When I was in Court with the parents in October and December 2016, I admonished them that their behavior between then and now could have an impact on my ruling as to custody. At page 2 of their report the doctor's (sic) states their

---

[2] Because only Danae is appealing the custody order we will exclude the findings relating to Brad.

18

opinion that quote "Mr. Starks and Mrs. Guillot present as immature, lacking insight and have tendencies to displace personal responsibilities onto others." Close quote. During this trial, I have learned that Ms. Starks after learning from her attorney what Mr. Starks' diagnosis was by psychologists texted that information to a friend comparing Mr. Starks to Jeffrey Dahmer and Charles Manson. That is such an immature thing to do that it just confirms the doctor's opinion. And even though I warned you that your behavior could have adverse consequences in my custody decision. Mr. Starks gave Ms. Starks his password to enter his IPad so that [Eastin] could play games. She used that as an opportunity to read his email. More immaturity and lack of good judgment. Because Ms. Starks wanted the order lifted prohibiting her from going to St. Mary's school we had a trial on that sole issue in December. I lifted that order allowing her to be able to go to the school. It was important that she be able to be involved in her children's lives in so far as their education was concerned. She would be able to go to their school extracurricular activities and generally be involved in their school lives. During this trial I learned from her that she had never returned to the children's school saying she did not want to because of what happened last year. Then why did you ask me to lift the order? You complained that you don't know how the children are doing and that you've never seen a report card, yet you, I lifted the order so that you can obtain all that information and you say that you aren't going to do that. Ms. Starks was giving (sic) Wednesday night visitations on her week off in the current visitation schedule yet she testified that she has never exercised any of the Wednesday visitations without explanation. . . . Ms. Starks will now have her visitation supervised by her parents. When Ms. Starks' visitations occur outside Natchitoches she will return the children by 5:00 pm on Sunday. . . .The court [finds] that the doctors' recommendations concerning each parent maintaining one year of sobriety to be monitored by monthly random drug and alcohol screens and weekly substance abuse treatment and psychological counseling as set forth to be in the report appropriate. . . .The doctor recommended that because of their, of their, immature and impulsive behavior, uh, I think were the words Dr. Visconte specifically used that both parents should be prohibited from possessing firearms . . . .The doctors made many other recommendations pretty much all of which I find to be appropriate.

### Dr. Shelley Visconte & Dr. Mark Vigen

Dr. Shelley Visconte was qualified as an expert in professional counseling and marriage and family therapy. Dr. Mark Vigen was qualified as an expert in the field of clinical psychology. Together, Drs. Visconte and Vigen conducted extensive testing and interviewing of the Starks along with home visitations. They interviewed collateral sources provided by Danae and Brad. Danae was diagnosed

19

with borderline personality disorder, major depressive disorder, episodic, and poly substance abuse.

The report provided by Drs. Visconte and Vigen notes that Danae "seems to be in denial" regarding the suicide attempt. However, the report goes on to state that both parents possess inconsistent and permissive parenting styles, neither properly supervises the children, both have demonstrated poor parental judgment, and both place their needs to punish each other above the well-being of their children. The report finds that "The histories, parenting deficits, and behavioral patterns of these parents are serious impediments to their ability to appropriately parent Eastin and Kennadi."

The entirety of Danae's argument is premised on her assertion that the trial court's underlying finding that she shot herself is the sole basis for the resulting interim custody order. We disagree. Although the attempted suicide is a significant event, there were other significant facts supporting the supervised visitation order. Thus, despite Danae's claims that the shooting is the sole reason that she is being denied custody, we find that not to be the case. The trial court clearly found the best interests of the children were served by being placed with the grandparents for a number of reasons, only one of which is Danae's continued denial of the self-inflicted gunshot wound. The record is replete with evidence that neither of these parents are in a position to properly parent these children. The trial court did not abuse its discretion in finding that continued custody with the grandparents, with the parents having supervised visitation, was in the best interest of the children. This interim custody order is subject to continued review and modification based on Danae's ability to comply with the recommendation of the professionals in order that she may work toward a less restrictive custody order.

**CONCLUSION**

The judgment of the trial court finding that Danae's gunshot wounds were self-inflicted is affirmed. The judgment of the trial court awarding interim custody to Ken and Jan Starks is affirmed. All costs of this appeal are assessed to the plaintiff-appellee, Danae Starks.

**AFFIRMED**.