# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-308

**STATE OF LOUISIANA**

**VERSUS**

**JERMAINE WASHINGTON, JR.**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 19564-18
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Pride Justin Doran**
**Quincy L. Cawthorne**
**Errin S. Green**
**Micaela Simpson**
**Doran & Cawthorne, PLLC**
**P. O. Box 2119**
**Opelousas, Louisiana 70570**
**(337) 948-8008**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Jermaine Washington, Jr.**

**Stephen C. Dwight**
**Fourteenth Judicial District Attorney**
**David S. Pipes**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GREMILLION, Judge.**

On October 25, 2018, Defendant, Jermaine Washington, Jr., was charged by indictment with one count of first degree murder, in violation of La.R.S. 14:30 and one count of felon in possession of a firearm, in violation of La.R.S. 14:95.1. Defendant pled not guilty. On April 20, 2023, Defendant was found guilty on all counts by a jury. On July 21, 2023, Defendant was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence for count one (first degree murder) and twenty years at hard labor, without benefit of probation, parole, or suspension of sentence for count two (possession of a firearm by a felon). Both sentences are to run concurrently.

Defendant filed a Notice of Appeal with the trial court on August 21, 2023, which was granted the following day. Defendant assigns as error:

1) The trial court abused its discretion in denying defendant's motion for mistrial due to the prejudicial conduct that took place inside and outside of the courtroom.

2) The evidence was insufficient to support the guilty verdict of first-degree murder and possession of a firearm by a convicted felon.

3) The trial court erred by allowing Devonte Stephens' recorded video interview to be introduced during Lieutenant Lavergne's testimony instead of Stephens' testimony, violating the appellant's right to confrontation and cross-examination. Furthermore, the court's refusal to provide a limiting jury instruction prejudiced the appellant by permitting the jury to consider the recorded statements for substantive purposes.

4) The trial court erred in allowing expert testimony from Lt. Lavergne regarding cell phone mapping, where he was not qualified to do so, constitutes a reversible error.

## FACTUAL BACKGROUND

In the early morning hours of July 4, 2018, Trooper Carlos Spina of the Louisiana State Police was dispatched to Highway 90, near Jones Street in Lake

Charles, in response to reports of a vehicle in a ditch or a crash. Trooper Spina found the vehicle, a 2018 Tahoe, in a ditch against a tree. While approaching from the driver's side of the vehicle, Trooper Spina observed an unresponsive black male in the driver's seat and a handgun on the floorboard of the driver's side. The man was subsequently identified as Dorian Colston. An autopsy determined that he sustained eight gunshot wounds, fired from the right side. The cause of death was homicide via gunshot wounds to the trunk and left upper extremity.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are two errors patent.

First, the trial court did not accurately advise Defendant as to the time period for filing post-conviction relief. Defendant was advised that he had two years from the sentence becoming final to file for post-conviction relief. According to La.Code Crim.P. art. 930.8(A), the time period for filing post-conviction relief is "two years after the *judgment of conviction and sentence* has become final[.]" (emphasis added). Thus, the advice given at sentencing was only partially accurate.

We agree with the first, second, and fifth circuits who have allowed their opinions to serve as notice to Defendant of the correct time limitation for filing an application for post-conviction relief:

> Finally, after the trial court imposed the sentences herein, it failed to advise the defendant of the applicable time period to file an application for post-conviction relief. . . . At the time of sentencing, the trial court shall inform the defendant of the prescriptive period for applying for post-conviction relief. **State v. LeBoeuf**, 2006-0153 (La.App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142, <u>writ denied</u>, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Its failure to do so, however, has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. Further, the Article does not provide a

remedy for an individual defendant who is not told of the limitations period. **Id.** at 1142-43.

> Out of an abundance of caution and in the interest of judicial economy, we advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Id.** at 1143.

*State v. Folse*, 23-1299, p. 11 (La.App. 1 Cir. 9/20/24), __ So.3d __, __ (2024 WL 4245979). Accordingly, Defendant is advised that pursuant to La.Code Crim.P. art. 930.8, no application for post-conviction relief, including applications seeking an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under La.Code Crim. P. arts. 914 or 922.

Next, La.R.S. 14:95.1 carries a mandatory fine of not less than one thousand dollars nor more than five thousand dollars which was not imposed at sentencing. The failure to impose a mandatory fine resulted in an illegally lenient sentence. Although the authority to correct an illegally lenient sentence is granted and discretionary under La.Code Crim.P. art. 882, because this issue was not raised as an error, we decline to take action. *See State v. Brown,* 19-771 (La. 10/14/20), 302 So.3d 1109 (supreme court found the court of appeal erred in vacating an illegally lenient sentence absent any complaint by the State).

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, which we will address first, Defendant asserts that the evidence is insufficient to prove beyond a reasonable doubt that he was guilty of first degree murder. In addition to more generalized claims that the evidence against him was lacking and inconsistent, he specifically argues that

insufficient weight was given to his "reasonable hypothesis" that explained his proximity to the murder scene, i.e. that at the time of the murder he was responding to a fire at his mother's house and that the State's key witness tying him to the murder had an underlying motive to give such testimony. The State counters that the essential elements of the offense, Defendant having the specific intent to kill and actually killing the victim in exchange for cash, were established by direct testimony and that this testimony was corroborated by the testimony of other witnesses as well as by scientific and video evidence.

When a defendant challenges the sufficiency of the evidence to support his conviction, that issue must be resolved first. *State v. Hearold*, 603 So.2d 731 (La.1992). The analysis for sufficiency of the evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess [sic] the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Louisiana Revised Statutes 14:30(A)(4) defines first degree murder, in relevant part, as the killing of a human being when the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing. Louisiana Revised Statutes 14:95.1

prohibits the possession of a firearm by a person convicted of certain prescribed offenses. Defendant has previously pled guilty to one such offense, illegal use of a weapon.

*Synopsis of the State's Case*

The State alleges that Defendant (also known as "Dutt") murdered Colston in exchange for payment from Josiah Jackson (also known as "Joday"), who wanted Colston killed due to a tip off that Colston was intending to rob him. The State alleges that Defendant tricked Colston into believing they were going to participate in a robbery together, so as to get Colston into a vehicle with him, then shot and killed Colston at close range just off of Highway 90 in between Lake Charles and Iowa in the early morning hours of July 4, 2018 and then fled from the scene in a car driven by Karrington Henry (also known as "Keke"). The State asserts that this hit was carried out for approximately $5,000, $2,000 of which went to Henry for his role as an accomplice and for damage to his car. The State alleges that at least some of this money was retrieved by Defendant from the gas tank of Jackson's vehicle the following morning.

*Evidence Presented*

The State put forward thirteen witnesses: Trooper Carlos Spina (Louisiana State Police); Terry Welke (Calcasieu Parish Coroner's Office); Kent Johnson (Calcasieu Parish Sheriff's Office, forensics); Captain Casey Lafargue (Calcasieu Parish Sheriff's Office, detective); Corporal Joe Duhon (Calcasieu Parish Sheriff's Office, anti-drug task force); Deputy Detective Jerod Abshire (Calcasieu Parish Sheriff's Department, Digital Forensics Unit); Barry Brooks (associate of Defendant, otherwise known as "Mocap"); Josiah Jackson (associate of Defendant, otherwise known as "Joday"); Karrington Henry (associate of Defendant, otherwise

known as "Keke"); Jason Raymond (Sheriff's Office, forensic investigator); Amber Downs (Louisiana State Police Crime Lab); Devonte Stevens (inmate); Chad Levier (inmate); and Detective Travis Lavergne (Calcasieu Parish Sheriff's Office, lead detective and case agent.)

According to Kent Johnson, a former member of the Forensic Investigation Unit at the Calcasieu Parish Sheriff's Office, evidence taken from the scene of the murder was consistent with the shooter having been on the front passenger side of the vehicle, as indicated by projectile damage on the driver's side interior door and blood on the driver's seat. Entry damage to windows on the passenger side as well as glass indention indicated that at least some of these shots had been fired while the shooter was standing by or at least moving outside the vehicle adjacent to the passenger side door.

Terry Welke of the Calcasieu Parish Coroner's Office testified that the autopsy reinforced these conclusions, indicating that Colston had been shot on his right side at an intermediate range of more than two to three feet. Of particular interest to investigators were a pair of black gloves and black bandanas found in the vehicle and red bullets recovered from both the vehicle and Colston's body. It was noted that the red-painted Syntech bullets are harder to match with specific firearms due to a polymer coating which reduces the number of striations that get imparted when the bullet travels down the barrel, but the fact that they were painted red nonetheless made them highly unusual and thus distinctive. A handgun was also retrieved from the driver's side, although this did not turn out to be the murder weapon.

Two cellphones were also retrieved from the vehicle, one of which had not been used since June of that year. The other cell phone, belonging to Colston, was

6

identified as 337-377-7038. It was determined from the text messages and calls that the timeframe of the murder was from 12:24 a.m. to 12:37 a.m., as these times were when the last message was sent from the phone and first unread texts/calls were sent to the phone respectively. A search of all the contacts and numbers therein turned up several potential suspects. One suspect derived from Colston's phone records had the phone number 225-439-5716 and was saved on Colston's phone using a "devil emoji and a gun." Another suspect with the phone number 337-532-7234 was then identified from the records for the 225 number. These numbers were subsequently identified as belonging to Defendant and Henry respectively, and cellphone mapping pinged both of them to the area of the murder in the suspected time interval of the murder.

The first persons of interest to be questioned in connection with this case were Henry and Brooks. Corporal Joe Duhon of the Calcasieu Parish Sheriff's Office, then assigned to the combined anti-drug task force, noted that a confidential informant had tipped police off to Henry's whereabouts. Henry and Brooks were subsequently discovered during a search of a residence at 708 Orange Street, despite Henry's attempts to hide behind a large stuffed teddy bear. Brooks was placed under arrest for possession of a significant amount of synthetic marijuana found in his adjacent vehicle. Brooks provided written consent for police to conduct an analysis of his cellphone records.

Brooks testified that he was familiar with the other people connected to this case and was, in particular, privy to the discussions which led to Defendant carrying out a hit on Colston.[1] A few days before the murder, Brooks was at Jackson's house

---

[1]Defense later submitted evidence showing Brooks's plea agreement regarding first degree murder charges, which were amended down to obstruction of justice.

when Defendant called Brooks to tell Jackson that Colston was trying to rob Jackson, at which point Brooks put Defendant on speaker phone so everyone could hear him. Jackson's own testimony at trial confirmed that this conversation occurred at his house, that Brooks and Defendant[2] participated, and that Defendant was speaking through Brooks as a middleman,[3] albeit at trial he refused to testify to certain details and would only admit to having said them to police at some point. According to Jackson, Defendant specifically asked him (through Brooks), "What do you want to do about that? Do you want me to knock him off?" Jackson testified that he understood this to mean that Defendant was asking him whether he wanted Defendant to perform a hit on Colston for him, but Jackson claimed at trial that he interpreted this as a joke which he did not take seriously and thus rejected it. Jackson also denied that a monetary sum was discussed at that juncture. By contrast, Brooks testified that Jackson specifically asked Defendant (through Brooks), "how much," to which Defendant replied, "We gonna talk. We gonna talk." Jackson also admitted that Brooks gave Jackson's phone number to Defendant, who utilized the number to call him after "it was already a done deal."

Detective Jerod Abshire of the Calcasieu Parish Sheriff's Office, an expert in digital forensics, was one of two officers who testified at trial concerning the cellphone extractions performed on the various cellphones involved in the case. The extractions turned up a conversation the night of July 3, 2018, between numbers

---

[2]He claimed at trial not to have heard Defendant's voice before but that Brooks identified Defendant for him.

[3]Jackson was inconsistent in his testimony as to what extent he heard exactly what Defendant was saying and to what extent he only heard it through Brook's relating of the details.

associated with Jackson and Brooks[4] with messages telling Jackson, "Dutt say he gonna [sic] try you tonight. But he ain't gonna [sic] make it there" and to "[d]elete all calls and texts from him[,]" to which Jackson responded with "Bet." Jackson denied receiving this text or sending the response but confirmed that the number in question was his. Brooks confirmed that this conversation took place, explaining that the first text meant that Defendant was going to do "something" to Colston, although Brooks denied that he knew that "something" meant that Defendant was going to kill Colston, despite having understood at this juncture that there was a price on Colston's head. Brooks understood "Bet" in this context to mean okay/alright. These same cell phone records indicated that Jackson and Brooks also discussed the murder the following day. In these messages, Brooks informed Jackson that the car was dead, which Brooks stated was code, sent him a screenshot of a group chat of people discussing the murder, told him to read between the lines, and informed him that "It's done though." Brooks noted that Jackson sounded confused during a follow-up call and gave indications that he may not have actually intended for the hit to work out as it did.[5]

Henry, the other person found at the 708 Orange Street residence, testified regarding his involvement in the events of the murder. Henry was aware of the Defendant's intention to kill Colston for money in advance of the murder. It was his understanding that Defendant was going to receive $5,000 in exchange for the murder from Jackson and that Defendant would pay him about $2,000 of that in exchange for bringing him to the murder scene and as compensation for damage to

---

[4]Brooks was listed as "Catherine Ann" in these messages, but this was later found to be an alias which Brooks confirmed at trial.

[5]Defense objected prior to this subject being discussed any further.

9

Henry's vehicle. Henry's understanding going into the murder was that Defendant's plan was to get into a vehicle with Colston on the false pretense that they were going to rob someone and then murder Colston at an opportune moment.

Henry testified that the events of the murder started in the late afternoon when Defendant arrived at Henry's sister's house where he was staying. They proceeded together in Henry's Lincoln to a Dollar Wise store on Highway 14 where Defendant met with Colston. Henry was not privy to exactly what they discussed. Security camera footage from the Dollar Wise store confirmed that Henry's vehicle was at the store around 6:00 p.m., that Defendant met Colston in Colston's vehicle while there, and that Defendant got back into Henry's vehicle afterwards. Cellphone location data also showed that phones associated with Colston, Henry, and Defendant were all in the vicinity of the Dollar Wise at this time. According to Henry, they went back to his sister's house before proceeding to Highway 90 to meet up with Colston later that evening. Defendant again got into Colston's car, but contrary to Henry's expectations, Defendant did not shoot Colston at this point, and the two instead drove off in the direction of Iowa while Henry went back towards Lake Charles.

Henry was unaware of Defendant's whereabouts after this point, but surveillance camera footage showed that Colston subsequently returned to the Dollar Wise store around 11:31 p.m. to purchase two pairs of gloves and black bandanas. Cellphone location data similarly indicated that both Defendant and Colston were in proximity to the Dollar Wise store at this time.

Henry met up with Defendant on Highway 90 again later that night after Defendant called him. Henry pulled onto the side of the road facing Lake Charles while Colston's vehicle pulled up close behind him. Henry was looking at his

rearview mirror, in anticipation of Defendant exiting Colston's vehicle, when Defendant began shooting at Colston. Henry specifically testified that he observed the muzzle flashes. At this point, Colston's car hit the back of Henry's vehicle and then proceeded into a nearby ditch after Henry pulled away. Although Henry did not provide an exact time, cellphone location data from when the State suspects the murder to have occurred shows that both Defendant and Henry's phones were together in the vicinity of the relevant stretch of Highway 90 where Colston's vehicle and body were subsequently found.

According to Henry, the first stop after the murder was Opelousas Street, where Defendant threw the murder weapon into a storm drain. There was no particular reason that street was picked. Cellphone tracking data indicates that Defendant's phone was in this area shortly after the murder. After disposing of the firearm, Henry testified that they proceeded to his sister's house before going to Brooks's house. Henry claimed that while they were at Brooks's house, Defendant called out to Brooks to come outside and meet him. Henry believed that the purpose of this discussion was for Defendant to tell Brooks to tell Jackson to get the money. Brooks's own testimony confirmed that Defendant arrived at his house sometime after midnight in a gold Lincoln MKZ which he knew belonged to Henry, although he was less certain at trial who else may have been in the car with Defendant. Brooks claimed that Defendant told him that he had "just offed [Colston]" and asked him to call Jackson to relay payment in exchange for the murder.

Henry proceeded to take Defendant to a Super 8 on Prien Lake Road, near Enterprise Boulevard and Interstate 210. Surveillance footage from the Super 8 corroborated this portion of Henry's testimony, as it showed Henry's car driving into the lot in the early morning hours after the shooting and Defendant getting out of the

vehicle.[6] Henry also claimed to have spent the night at a hotel, but this is inconsistent with Brooks's testimony, as Brooks claimed that Henry spent "one night" with him after the murder. Henry testified that he and Defendant went to Jackson's house sometime the following day, where they recovered approximately $2,000 to $3,000 from the gas tank of Jackson's vehicle, which Henry claimed had been placed there for killing Colston. Henry was handed his $2,000 at this point.

Jason Raymond, a forensic investigator for the Sheriff's Office,[7] subsequently recovered a firearm from a city storm drain off of Opelousas Street about two weeks before trial. It was noted at the time that while the magazine for the weapon still contained four rounds, there was room in the magazine for more rounds. Amber Downs, from the Louisiana State Police Crime Lab, noted that while the red polymer coating complicated identification, she was nonetheless able to determine that the shell casings from the rounds expended at the murder scene were fired from the recovered firearm.

In addition to the witnesses directly involved with the events of the murder, the State also introduced two witnesses who previously claimed to have spoken to Defendant regarding the murder while incarcerated. Neither ultimately testified in support of the State's case. Devonte Stevens testified first, having given a statement to detectives on March 17, 2020, which was video recorded. Stevens was housed one cell over from Defendant. At the time, he claimed that he had known Defendant's brother for two years and that Defendant had told him that he was a

_____

[6]This same footage showed Defendant wearing white pants, rather than all black clothing. It was later pointed out during cross-examination that while this was consistent with what he was wearing at the Dollar Wise store earlier, it was otherwise an inexplicable sartorial choice considering the fake plan (attempted robbery, hence the black gloves/bandanas) and the actual plan (murdering at close range, considering the risk of blood spatter).

[7]Raymond presumably is referring to the Calcasieu Parish Sheriff's Office.

hitman who had killed Colston. At trial though, Stevens claimed he did not recall the contents of this meeting nor any of his statements that the State referenced at trial. His memory could not be jogged, and he claimed he was unable to identify Defendant in the court room. Chad Levier testified afterwards, stating that he was incarcerated in the same cellblock as Defendant. He also testified that he had told law enforcement while he was incarcerated with Defendant that Defendant had told him that he killed Colston for about thirty "bands[.]"[8] However, he testified that this had all been a lie and that nothing of the sort had been said. The State was unable to get him to testify differently, despite insinuating that he had said otherwise thirty minutes before trial.

The State's last witness was Detective Travis Lavergne of the Calcasieu Parish Sheriff's Office, the lead detective in the case. He explained the overall course of the investigation described above, particularly how Defendant was identified from information on Colston's phone, how Defendant was made a priority suspect after cell phone location data showed he was in the area of the murder at the suspected time, and how they discovered Henry's proximity to the events early on through similar means. He introduced certified records from Jefferson Davis Parish which indicated Defendant's prior plea to illegal use of a weapon.

Detective Lavergne also provided context to Stevens' prior statements to police, a recorded copy of which was provided to the jury. At the time of his jailhouse interview, Stevens talked about details of the case that were not then public knowledge, such as the precise nature of Colston's injuries and the involvement of a second person in the murder. Stevens also apparently knew some of Defendant's

---

[8]This was subsequently identified as meaning about $30,000.

13

biographical details, such as where he lived, where his mother lived, what charges his brother recently had dropped, and so on.

Detective Lavergne, due to his experience with the Calcasieu Parish Sheriff's Department's Digital Forensics Unit, was also accepted as an expert in "cellphone record analysis and mapping." He explained the significance of the various cellphone maps introduced into evidence, including those we have already discussed. The maps showed the phones associated with Colston and Defendant leaving the Dollar Wise after 11:34 p.m. and proceeding in the direction of Highway 90 and, that at a certain point, Henry's phone began to overlap with Colston and Defendant's locations. All three phones continued to overlap during the suspected interval of the murder, between 12:25 a.m. and 12:31 a.m. By 12:25 a.m., the location data indicated that the phones associated with Defendant, Colston, and Henry were all in the Iowa area, seemingly more to the western side of town. Around 12:28 a.m., the phones clearly began to leave the Iowa area and move towards Lake Charles along Highway 90.

Detective Lavergne stated that some of the later maps were consistent with the direction of travel that police believed Colston's murderer took after the killing. He specifically highlighted an exhibit that showed the phones associated with Defendant and Henry in the vicinity of Opelousas Street (where the murder weapon was found) around 12:42 a.m. which would be consistent with Henry's account of how they disposed of the murder weapon. Detective Lavergne also noted that the security camera footage from the Super 8 on East Prien Lake Road corroborated these mappings, as it showed Defendant in the vicinity around 1:59 a.m. Detective Lavergne noted that the other persons of interest in the case whose phone data was

14

tracked, such as Brooks and possibly Jackson, were not in the right locations to have participated in Colston's murder.

Along with Detective Lavergne's testimony, the State introduced a video recording of statements made by Defendant to police on July 12, 2018, Defendant denied that he killed Colston or had anything to do with his murder, instead stating that he and Henry rode to the Iowa area and back that night. Defendant's alternative explanation for his whereabouts that night, and thus his alibi, was that he was at his mother's house due to a house fire. As his mother's house was located in Iowa approximately 3.3 miles from the crime scene, Detective Lavergne conceded that her house would at least sometimes fall within the red rings (indicating the location of the phone associated with Defendant) at certain points around the time of the murder. Both the Calcasieu Parish Sheriff's Office and Iowa Fire Department suspected that this fire was arson rather than accidental.

Defendant also had alternative explanations for his whereabouts earlier in the evening. For example, he claimed to smoke marijuana four to five times a day and frequently bought marijuana from Colston, including the day of the murder. One witness at the Dollar Wise questioned by police, Quentin Hollins, testified that he bought some marijuana from Colston at the same time Defendant was at the Dollar Wise. Defendant also claimed to have met up with Colston later that evening to purchase marijuana again, sometime between 8:00 p.m. and 11:00 p.m., on Anita Drive and Sixth Street across Highway 14 from Famous Foods, but this interval is not covered by any of the relevant cellphone location maps in the exhibits. Defendant claimed not to have seen Colston after this point.

The defense cross-examined Detective Lavergne concerning the cellphone evidence in this case, particularly concerning Defendant's proximity to Henry at

15

certain moments around the time of the murder. The defense noted, and Detective Lavergne confirmed, that there were several phone calls from Defendant to Henry after the fire was reported at 11:30 p.m. and before the murder, which, as previously mentioned, is suspected to have occurred around 12:30 a.m. These calls included calls between 11:57 p.m. and 12:27 a.m. Considering these facts, the defense asked Detective Lavergne whether this evidence suggested that Defendant and Henry were not together during this time interval, and the Detective agreed. The defense also asked Detective Lavergne whether the cellphone evidence in this case was consistent with Defendant's alternative explanation that Henry brought Defendant to his mother's house, left him to go back to his sister's house, and that Defendant began calling Henry repeatedly to come pick him up after enough time had passed. Detective Lavergne conceded this was possible, with a caveat that Henry did not actually go to his sister's house; but it was pointed out that it was not necessary for Henry to have been truthful for Defendant to have *believed* him to be doing so. Detective Lavergne also conceded that it was possible that their eventual rendezvous could have occurred immediately following the murder, considering the very short distance from the crime scene to Defendant's mother's house.

Building upon the above, the defense also questioned Detective Lavergne concerning Henry's possible ulterior motives. As the defense noted, Henry was the only one who placed Defendant at the scene of the murder. The defense asserted, and Detective Lavergne conceded, that Defendant was fairly new to the social circle with Henry and Brooks who were "like brothers" to each other. Detective Lavergne acknowledged that Henry was familiar with the location of Defendant's mother's house, as well as the general vicinity of Iowa, when planning the events of the night

out and conceded that it was at least possible that the fire at Defendant's mother's house may have been a deliberate attempt to set him up as a scapegoat.

The defense then drew attention to surveillance footage from the Dollar Wise from merely an hour before the murder which showed a woman wearing a red bonnet there at the same time as Colston. She was subsequently identified as Catherine, or Cat for short. As it turns out, she was well known to both Colston and Henry, appearing in both of their cellphone records. Further, she was heavily implied to be in a sexual relationship with Colston at the time of the murder due to numerous sexually explicit messages exchanged between the two. One message in their conversation apparently indicated that Catherine did not want people to know about the nature of their relationship and specifically called out "Keke[,]" i.e. Henry, in the message.

The implication of these and other facts would be that Henry had the motive to kill Colston due to his relationship with Catherine, was distant enough from Defendant that he might be willing to let Defendant take the fall for him, had the requisite knowledge to ensure Defendant was in all the right places at the right times for this to occur, and that Brooks had every reason to help Henry set this up or at least cover for him at trial. Henry was then called back to the stand for further information regarding his relationship with Catherine. While Henry confirmed he had dated Catherine a few years prior and was still having sex with her at the time, he testified that he was in a relationship with someone else at the time and that Catherine was not the only woman he was having sex with outside of said relationship.

The defense also attempted to point out inconsistencies in Henry's testimony. One such inconsistency between his and Brooks's testimony related to where Henry

spent the night after the murder. Another inconsistency involved his recollection of how Henry claimed to have observed the actual shooting, specifically how the area was illuminated. While Henry testified that he saw lights come on inside Colston's car, the first witness on scene claimed that the lights in Colston's car were off when he got there. It was later noted that car lights come on when car doors are opened, and since the forensic evidence suggested that some shots were fired while the door was open, it was possible that this is why the lights were on when Henry was looking but not later on.

*Analysis*

The evidence in this case is more than sufficient to support Defendant's conviction for first degree murder and the firearm possession charge. As previously noted, first degree murder is the killing of a human being where the offender has the specific intent to kill or inflict great bodily harm and offered, has been offered, has given, or has received anything of value for the killing. The State presented witnesses who testified that they personally witnessed Defendant commit both elements of the offense. Henry testified that he personally witnessed, through his rearview mirror, Defendant shoot Colston. Brooks testified that he personally participated in a conversation where Defendant solicited or at least opened negotiations to receive something of value from Jackson in exchange for the murder, while Henry testified that Defendant took this money from Jackson's vehicle the day after the murder. The State proved through the same evidence that Defendant possessed a firearm illegally, considering the record of his prior plea to illegal use of a weapon that was submitted during trial.

The State introduced significant physical and digital evidence corroborating the testimonies of Henry and Brooks, as well as that of the other witnesses.

Cellphone location data placed Defendant in the area of the murder and all of the other points of the night that Henry described in his testimony, which was also corroborated by video surveillance footage where available. The murder weapon, as demonstrated by matches with the highly distinctive red bullets used in this killing, was found exactly where Henry said it was, and cellphone location data indicates that both Henry and Defendant were in the area where the weapon was disposed of at the precise time that Henry specified. The forensic evidence from the scene, indicating the murderer had shot Colston from the passenger side of the vehicle, with at least some of these shots coming from a shooter standing directly outside the vehicle, was consistent with Henry's account of how the murder actually occurred. Other evidence available at the scene, specifically the black gloves and bandanas, corroborated the State's theory (itself derived from Henry's testimony) that Defendant tricked Colston into thinking that they were going to go rob someone together, before actually pulling the gun on him and escaping with Henry.

Jackson's testimony and additional cellphone evidence provided strong inferences as to Defendant's financial motives, and this same evidence corroborated other portions of Brooks's and Jackson's testimonies and the existence of the group phone call which set the events of this murder in motion. The State even introduced two witnesses who claimed that Defendant had confided to them concerning the murder, albeit both witnesses recanted despite their prior statements being presented to the jury. The State has thus produced overwhelming evidence tying Defendant to the murder and compelling evidence supplying the motivation.

Defendant's arguments against this finding largely revolve around his alternative explanations for hiss whereabouts during the key events of the night and, in particular, allegations that Henry was either himself the murderer or at least the

main instigator. While Defendant's arguments here are non-frivolous and merited close consideration, the weighing of such arguments is the role of the fact finder, not the appellate court. The jury ultimately decided that the State's conclusions were more credible in light of the available evidence, and it is not the place of this court to second-guess their credibility determinations. What minor inconsistencies there are in the testimonies of the various witnesses are overridden by the overwhelming physical, digital, and testimonial evidence corroborating the essential facts necessary to the State's case. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant asserts that he should have been granted a mistrial due to prejudicial conduct inside and outside the courtroom that tainted the jury pool. Specifically, Defendant contends that allegations of jury tampering conducted by members of Defendant's family in the court parking lot caused rumors which created discomfort for several jurors, with Defendant claiming that at least one juror even admitted to having felt unintentionally intimidated as a result of the situation. Defendant further emphasizes the role a bailiff played as both the source of the rumors and as an aggravator for the juror's discomfort, as the bailiff apparently told the jurors to let him know if they felt uncomfortable about the underlying situation. The State countered that the incident was "blown out of proportion" and that no prejudice was actually proven in this case; no juror stated that any discomfort or confusion arising from the situation would influence his or her decision making.

Louisiana Code of Criminal Procedure Article 775 provides, in pertinent part, that, "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it

impossible for the defendant to obtain a fair trial[.]" A trial court has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial, and the granting of a mistrial is a drastic remedy which should only be granted upon a clear showing of prejudice by the defendant. *State v. Cormier*, 24-318 (La. App. 3 Cir. 12/4/24), __So.3d __ (2024 WL 4964624) (quoting *State v. Leonard*, 05-1382, p. 11 (La. 6/16/06), 932 So.2d 660, 667.)

This court has dealt with issues of potential jury contamination arising from allegations against a defendant that were seemingly reinforced by precautions undertaken by security personnel. In *State v. Surratt*, 05-1406 (La.App. 3 Cir. 6/7/06), 932 So.2d 736, *writs denied*, 06-2100, 06-2102 (La. 6/1/07), 957 So.2d 165, although it was not clear that anything unusual occurred during the relevant trial, the rumor circulating among the jurors was that a knife had been smuggled into the jail where the defendant in that case had been housed. The source of these rumors was a discussion between a security guard and a court employee in the hallway outside the venue for voir dire, within earshot of at least one juror, with the guard reportedly saying that he was "watching the driveway 'because something about a knife was passed to somebody.'" *Id.* at 753. It was possible that some deputies connected to this incident also mentioned the defendant's name while they did so. The jurors' concerns were heightened and, in the eyes of some, corroborated by the unusually heavy security presence in and around the courtroom at that time. After interviewing all of the jurors personally, the trial court ultimately concluded there was insufficient prejudice to justify a mistrial which this court upheld on appeal as most of the potential jurors had not heard anything, and those who had (including one who ultimately served) did not actually hear anything specifically tying the defendant in that case to the alleged incident.

21

When considering other cases involving allegations which were alleged to have caused jury contamination, this court has also considered factors such as how many jurors were potentially impacted and whether the allegations were of the same nature as the charges the defendant was facing. *State v. Brandenburg*, 06-1158 (La.App. 3 Cir. 2/7/07), 949 So.2d 625, *writ denied*, 07-538 (La. 10/26/07), 966 So.2d 571, *and writ denied*, 07-614 (La. 10/26/07), 966 So.2d 573.

The incident in this case arose after a member of the jury pool allegedly reported to the bailiff that, during a break in proceedings during the afternoon of April 17, 2023, several members of what were suspected to be Defendant's family were "leaning on some of the jurors' cars" and making them "very uncomfortable." The family members complied with requests by court employees to leave but continued to hang around the area and also caused issues the following morning by getting too close to where the inmates were being unloaded. While the trial court was shaken by the possibility that Defendant's family was obstructing justice, defense counsel pointed out, and the trial court accepted as plausible, that this may have been a complete coincidence arising from the family members having been parked nearby. It was noted that the victim's family was also causing problems.

Upon interviewing the jurors, it became apparent to the trial court that the situation had been blown out of proportion. The juror who reported the incident, juror nine, told the court that the "incident" amounted to a handful of people talking among themselves behind her vehicle while she had lunch inside. She did not suspect ill intentions, never felt intimidated, and did not recognize the people in question. Indeed, the only concerns she had stemmed from her worries about the appearance of impropriety if she was seen interacting with people, i.e., the concern was regarding herself rather than directed at the people in the parking lot. Another

22

juror who had witnessed the incident, juror two, similarly reported that the people in question were doing nothing out of the ordinary. While she stated she was "on guard" for juror nine, she was not personally concerned, intimidated, or affected in any way.

This pattern repeated itself across the jurors. While most of the jurors were aware, via discussions amongst themselves, that something had supposedly happened and that it involved people in the parking lot, almost none of them admitted to feeling any concerns aside from generalized uncertainty and discomfort. Most concerns were instead felt on behalf of other jurors. Not a single juror stated that incident would have any bearing on his or her deliberations, nor did any juror say he or she was actually intimidated.[9]

Most surprisingly to the trial court, not a single juror connected the individuals to Defendant. Many of the jurors had no idea who the persons were. Jurors two and three identified them as people sitting behind the prosecution's table, while juror eleven positively identified them as members of the victim's family. The other surprising revelation to come from the jury questioning was that at least some of the concern appeared to have been generated by the bailiff's interventions. Juror eight was unaware of the situation "[u]ntil the bailiff said something" about "some people, you know, standing around the car and such[.]" Alternate one went further and said, "Actually, Mr. Keith, the bailiff, had made us aware. And just for our own comfort, if we felt uncomfortable, to let him know." Neither of these jurors expressed any discomfort with the situation. Defendant moved for a mistrial pursuant to La.Code

---

[9]In his brief, Defendant claimed that juror five said "she felt intimidated in some manner" as a result of the situation. When the court asked if she felt she had been "intimidated in any manner whatsoever[,]" she responded, "[n]ot intentionally" before going on to describe how she was concerned by seeing people from the courtroom standing around the parking lot but did not remain concerned afterwards.

Crim.P. art. 775 after the final juror was interviewed, but his motion was denied by the trial court.

While most of the jurors heard rumors of the parking lot incident and many expressed mild discomfort with the developments surrounding it, none of their statements raised the possibility that their views might be compromised or that the jury pool was tainted. None of the jurors felt that they were being subjected to intimidation, intentional or otherwise, by the time the trial court began investigating the matter. Further, none of the jurors appeared to have connected the incident to Defendant or his own family members, which, when contrasted with other cases this court has examined, raises questions of how exactly this incident and the bailiff's response to it could have prejudiced jurors *against* Defendant. Defendant has not proven substantial prejudice such that he did not receive a fair trial and, therefore, the trial court did not abuse its discretion in denying the motion for a mistrial. Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, Defendant asserts that the trial court erred in its handling of the testimony of Stevens when it: (1) allowed the State to introduce a recorded video interview of his statements to police during the testimony of a later witness instead of during Devonte Stevens' own testimony; and (2) refused to provide a limiting instruction to the jury prohibiting them from considering the recorded interview for substantive purposes. As these are two separate claims, we will discuss them separately.

*Confrontation Clause*

United States Constitutional Amendment XI and La.Const. art. 1, §16 guarantee the right of an accused in a criminal trial to confront witnesses against

24

them. These protections extend to testimonial out-of-court statements introduced at trial. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004).

Stevens testified as a witness for the State on April 18, 2023, and was cross-examined by Defendant during his initial testimony. When confronted with the video recording of his statement to police given at the time, he insisted that he did not remember giving the statement but confirmed he had seen the recording and that it did not look edited or altered in any way. The State introduced the video recording of Stevens' interview with police the following day during Detective Lavergne's testimony. Defendant objected to this due to confrontation clause issues, emphasizing his concern that such a move would prohibit him from confronting Stevens regarding his statements and noting that the State already had an opportunity to introduce this recording. The trial court overruled this objection, as well as Defendant's separate request for a limiting instruction, but arranged for Stevens to be brought back for questioning. The trial court reasoned that this offered Defendant the chance to cross-examine him after the video was played. Stevens arrived later that day, but when the trial court asked Defendant whether he wanted to keep him around for cross-examination, Defendant specifically said, "I have no reason to keep Mr. Stephens [sic]."

Defendant had the opportunity to cross-examine Stevens concerning the recorded statement and expressly opted not to do so. Accordingly, this claim is meritless.

*Limiting Instruction*

Louisiana Code of Evidence Article 801(D)(1)(a) provides that a prior statement by a witness is not hearsay, and thus can be considered for the truth of the matter asserted therein, if: (1) the declarant testifies at trial; (2) the declarant is

subject to cross-examination regarding the statement; and (3) the statement is inconsistent with the declarant's testimony, "provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]" This has been the case since amendments enacted in 2004. *State v. Doyle*, 23-696 (La.App. 3 Cir. 5/22/24), 388 So.3d 1226. A witness's failure to recall a statement is valid grounds for impeachment. *State v. Dubroc*, 99-730 (La.App. 3 Cir. 12/15/99), 755 So.2d 297.

As noted above, Stevens testified at trial and was available for cross-examination after the presentation of the recorded video statement. His attention was fairly directed to the recorded statement and its contents during his testimony, he admitted he had seen it, and he testified that it did not seem edited or altered in any way. Much of the evidence admitted at trial corroborates his assertions during the recorded statement. The requirements set forth by La.Code Evid. art. 801(D)(1)(a) were clearly met here. Therefore, the statement was admissible for its substance and no limiting instruction was required. This claim is meritless.

The State is correct in its assertion that this assignment of error is predicated on fundamental misunderstandings of both law and fact. No limiting instructions were necessary. Accordingly, it is entirely without merit.

### ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth assignment of error, Defendant asserts that Detective Travis Lavergne should not have been allowed to give expert testimony regarding cellphone mapping. Defendant argues that Detective Lavergne lacks sufficient knowledge or training on the matter, pointing out that he has not been previously certified as an

26

expert, only began seeking the relevant certifications in 2018 and freely admits his desire to seek further training, and that "it has not been proven that the cellular record mapping and analysis is reliable enough to establish opinion testimony."

The defense also argues that his role as a detective in the investigation may have negatively affected what judgment he was able to offer. The State counters that Detective Lavergne has been studying the subject continuously for at least five years, that the desire for further training is not a negative, that nothing was presented which proved or even asserted that he actually lacked the necessary knowledge, and that the allegation of potential bias does not go towards his qualifications or the trial court's decision to admit him as an expert.

A trial court's determination regarding the qualification of an expert witness cannot be disturbed absent an abuse of discretion. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024. Louisiana Code of Evidence Article 702(A) provided, in pertinent part, that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

Historical cell site analysis and its methodologies are routine law enforcement tools that this court has consistently found admissible when challenged. *See Starks v.*

*Starks*, 17-1139 (La.App. 3 Cir. 6/27/18), 250 So.3d 1025; *State v. Davis*, 13-275 (La.App. 3 Cir. 10/23/13), 129 So.3d 554, *writ denied*, 14-10 (La. 6/13/14), 140 So.3d 1186, *cert. denied*, 574 U.S. 1014, 135 S.Ct. 678 (2014); and *State v. Saltzman*, 13-276 (La.App. 3 Cir. 10/23/13), 128 So.3d 1060, *writ denied*, 14-11 (La. 6/13/14), 140 So.3d 1187, *cert. denied*, 574 U.S. 1014, 135 S.Ct. 678 (2014).

The *Daubert* hearing regarding Defendant's motion to exclude was held on April 11, 2023. Detective Lavergne has not previously testified as an expert but has testified at trial three times. Concerning his technical training, he testified at this hearing that he has attended several specialized trainings on cell phone data investigative practices, including one hosted by the National White Collar Crime Center in 2014, a 40 hour ZetX specific training in April of 2018, a ZetX training concerning Fugitive Missing Persons Planning and Cell Phone Investigative Techniques in June of 2019, another Introduction to Cell Phone Investigations course hosted by the National White Collar Crime Center in March of 2020, a ZetX training conference in November of 2020, and AT&T carrier specified training hosted by Cellhawk Analytics in October of 2021, which is of particular relevance, as AT&T was the carrier for Defendant and Henry. He emphasized that numerous other training courses he attended in 2016, 2017, 2019, 2020 (including a 5-day course), 2021, and 2022 all included substantive components relating to cellphone record investigations.

Demonstrating his expertise, he spent significant amounts of time explaining the mechanics of cellphone data, including how records are kept, what sort of data the phone is sending, how the locations are actually tracked, how phones are "handed off" from tower to tower, trilateration (when multiple towers are contacting each other), and other related technical subjects, and was subsequently able to answer

28

specific questions from Defendant regarding technical details without apparent issue. He also discussed some distinctions specific to AT&T, mainly relating to terminology. He did mention that there is additional training he would like to attend, such as a five-day class offered by ZetX, a month-long program exclusive to FBI CAST agents, and a Subsentio/Cellhawk class taught by FBI CAST agents.

Concerning his practical experience, he testified that he has been engaged in cellphone data analytics and mapping work since 2014 and is the lead person in the Calcasieu Parish Sheriff's Department regarding cellphone data analysis. The State emphasized that Detective Lavergne is considered to have the most relevant training and experience of the 700 employees working for Calcasieu Parish Sheriff's Office and is frequently consulted by the Digital Forensics Unit. He testified as to how his experience and training enabled him to track fugitives in prior cases using the relevant cellphone location data. One of his colleagues testified on his behalf. Detective Jerod Abshire,[10] head of the Calcasieu Parish Sheriff's Office Digital Forensics Unit and himself an expert in digital forensics who gave testimony in this case, testified that he goes to Detective Lavergne when he personally requires the assistance of an expert in cellphone data analysis.

Defendant also raised questions about the reliability of the ZetX software and the records that are input into it. As Detective Lavergne explained, the ZetX software is simply a tool that takes the underlying records obtained from a phone carrier, which includes cell site location data and estimated GPS locations, and projects this data onto a map. Detective Lavergne is capable of doing this step

---

[10]Detective Abshire's testimony is notable considering that he is a digital forensics task force officer trained by and assigned to work with the Secret Service. Further, Abshire was ranked at the time of trial as the twenty-first best digital forensic investigator in the nation.

manually and has checked the output of the ZetX software against his own work at times, but the software can do this task in minutes whereas it would take Detective Lavergne days. He also has engaged in peer review both for his own manual plottings and for the plottings of other detectives, including for the cellphone data previously examined by this court in *Saltzman*, 128 So.3d 1060, and *Davis*, 129 So.3d 554. Although Defendant is not specific in his brief as to which records he finds unreliable and why, during the hearing Defendant specifically cited to warnings included with AT&T's records which state that the location data therein are a "best estimate[,]" and investigators are advised to "exercise caution using these records for investigative purposes as location data as [this] location data is sourced from various databases, which may cause location results to be less than exact." Detective Lavergne testified that those warnings are better understood as advice not to rely solely on the data therein and to keep in mind the variance of location accuracy that the data can give depending on the area. He had already explained the reasons for the variances in ranges earlier in his testimony, repeated them at trial, and where relevant included the estimated accuracy range on his timelines.

The defense did raise questions concerning why Detective Lavergne did not employ a particular sub methodology employed in previous cellphone data cases examined by this court, known as the drive test. The drive test utilizes a device simulating the to-be-tracked phone, and thus emits the radio frequency for the desired carrier, is placed in a vehicle and driven to various locations to see which cellphone towers are pinged. Detective Lavergne explained that the investigators in those prior cases required additional data to test the range and accuracy of the relevant towers, whereas detectives in this case had access to software such as NELOS which obviated that need.

We agree with the trial court's assessment that Detective Lavergne is "obviously very knowledgeable in the information retrieval that he is being posited as an expert in." Both his training and his relevant professional experience is extensive, and his professed desire for more training is not evidence of a current lack of training. The methodologies and underlying data appear reliable and are not meaningfully distinct from expert testimony this court has accepted in past cases, and there does not appear to be any indication that Detective Lavergne applied them incorrectly. In particular, there appears to be nothing to support Defendant's assertions that the ZetX software is actually unreliable at performing the limited task it was employed for and which Detective Lavergne was capable of replicating manually if needed. Defendant's objections relating to his status as a police officer, and thus potential bias in his expert testimony, is more a question of weight of the evidence than its admissibility, and thus more properly a matter for the factfinder to consider. Accordingly, this assignment of error is without merit.

## DECREE

Defendant's convictions and sentences are affirmed. Defendant is advised that in accordance with La.Code Crim.P. art. 930.8, no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.Code Crim.P. arts. 914 or 922.

**CONVICTION AND SENTENCE AFFIRMED.**